# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **PEGASUS EQUINE GUARDIAN ASSOCIATION** | : | **CIV. ACTION NO. 2:17-cv-0980** |
| **VERSUS** | : | **JUDGE SUMMERHAYS** |
| **UNITED STATES ARMY, ET AL.** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court are cross-motions for summary judgment filed by plaintiff Pegasus Equine Guardian Association ("Pegasus") [doc. 96] and defendants the United States Army and Brigadier General Patrick D. Frank, in his official capacity as commanding general of Fort Polk and the Joint Readiness Training Center ("JRTC") [doc. 101]. Both motions have been fully briefed and the matter is now ripe for review.

## I.
### BACKGROUND

This action arises as an administrative appeal of the defendants' actions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, relating to their decision to remove horses from Fort Polk and the JRTC training areas.

Fort Polk, which also serves as headquarters for the JRTC, is located on approximately 260,000 acres of Department of Defense and United States Forestry Services land in west-central Louisiana. JRTC-B-000052. The installation supports at least ten annual training rotations through the JRTC "under conditions that simulate low- and mid-intensity conflicts." *Id.* Training activities occur at both the Main Post and nearby Peason Ridge. JRTC-B-000053–54.

In September 1999 the Army Corps of Engineers issued a final report entitled "Protection of Restored Lands," describing problems with "trespass horses" roaming over these training grounds and options for their removal. JRTC-E-002980–JRTC-E-003139. Based on that report and information from the Forestry Service, the Army compiled a record of environmental consideration ("REC") concerning removal options. JRTC-E-003524–60. There it noted that, according to the Department of Agriculture ("USDA"), the animals were not protected by the Wild and Free Roaming Horses and Burros Protection Act of 1971 ("WHBA"), 16 U.S.C. §§ 1331–1340. JRTC-E-003524. The Corps of Engineers then determined that the horses could be captured and removed without significant environmental consequences. JRTC-E-003524–25. The Coalition of Louisiana Animal Advocates ("COLAA") challenged the removal plans under the APA, through a lawsuit filed in the United States District Court for the Eastern District of Louisiana. After summary judgment briefing, the court adopted the defendants' finding that the horses were trespass livestock who had roamed onto the land from adjacent ranches and farm areas. JRTC-B-000148–50. Accordingly, it affirmed the defendants' determinations on WHBA coverage and removal of the trespass horses. JRTC-B-000139–155. The parties reached a settlement while the case was on appeal, but the Fifth Circuit nevertheless affirmed the lower court's decision on WHBA coverage. Doc. 101, p. 12; JRTC-B-000156; *see COLAA v. USDA*, No. 01-31361 (5th Cir. Mar. 11, 2003).

In April 2016, the Army completed a draft environmental assessment ("EA") on the elimination of trespass horses from Fort Polk and the Peason Ridge military training area. JRTC-B-000038–JRTC-B-000138. There it observed that the Peason Ridge training area had expanded through the purchase of new lands in 2012, and that an increasing number of trespass horses populate the training area. JRTC-B-000052, JRTC-B-000085. It described the impacts of the

horses on training events and the danger they posed to base population and property. JRTC-B-000054–61. It also found that the base was an unsuitable environment for the horses, due to the risk of injury or death they faced from training equipment and live fire exercise. JRTC-B-000057–58. It noted that existing efforts to control the horse population through sterilization and public capture programs, termed a "no action" Course of Action ("COA") under the current assessment, "would not resolve the personnel safety and training impacts in the reasonably foreseeable future (more than 20 years)," while the other proposed COAs would resolve those impacts within approximately three years. JRTC-B-000040–41. It then considered six other COAs, determined that none would have significant environmental impacts, and selected the "Cyclic 4 Step (Adopt, Give Away, Sell, Relocate)" alternative as the least aggressive course that would satisfy the needs described above within a reasonable time. JRTC-B-000066–130.

The EA and an associated draft Finding of No Significant Impact ("FONSI") were released for public comment on May 4, 2016. JRTC-A-000003. Based on comments received, the Army adjusted certain aspects of the adoption program under the Cyclic 4 Step COA to better accommodate 501(c)(3) agencies. JRTC-A-000004–5, JRTC-A-000023. It then confirmed the Cyclic 4 Step COA as its chosen plan for dealing with the trespass horses on August 8, 2016, by FONSI signed by the commanding general. JRTC-A-000001–6.

Pegasus is a non-profit regional conservation organization with members who recreate in and enjoy the landscape of Fort Polk and the adjoining Kisatchie National Forest. Doc. 1, pp. 4–5. It filed suit in the United States District Court for the Middle District of Louisiana, challenging the August 2016 FONSI under the APA as violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq. Id.* at 6–22. It seeks declaratory and injunctive relief, as well as an award

of costs and attorney fees. *Id.* at 22–23. At the defendants' motion, the case was transferred to this court on August 1, 2017. Docs. 25, 26. Pegasus moved for a partial preliminary injunction, which the court denied after a hearing on January 30, 2018. Docs. 43, 67, 81. The claims have now been fully briefed through the pending cross-motions for summary judgment [docs. 96, 101] and the matter is ripe for review.

## II.
### LAW & APPLICATION

#### A. Record Challenges

##### 1. Applicable law

Pegasus's suit challenges the August 2016 FONSI, a final agency action, and is thus governed by the Administrative Procedure Act. APA review requires a court to consider "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Under this principle, known as the "record rule," "[a]gency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision." *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F.Supp.2d 604, 610 (W.D. La. 2010) (quoting *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n. 8 (5th Cir. 1988)). The record rule is not absolute, however, and courts within this circuit have recognized several exceptions.[1] *Id.* at 611. Generally, extra-record evidence may

---

[1] In the broadest construction within this circuit, such exceptions may apply where:

> (1) the agency does not adequately explain its action in the administrative record supplied to the court; (2) the agency failed to consider factors relevant to its final decision; (3) the agency considered evidence omitted from the administrative record; (4) the case is so complex that additional evidence is needed to enable the court to clearly understand the issues; (5) evidence arising after the agency action shows whether the decision was correct or not; (6) the agency is sued for failing to take action; (7) the case arises under the National Environmental Policy Act ("NEPA"); and (8) relief is at issue, especially at the preliminary injunction stage.

be used to support a claim that the agency ignored relevant factors that it was required to consider. *Triplett*, 2009 WL 792799 at *8; *see also Coalition of Concerned Citizens to MakeARTsmart v. Fed. Trans. Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 899–900 (10th Cir. 2016). Under this exception, a NEPA claim in particular may invite consideration of extra-record evidence. *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 247 (5th Cir. 2006).

### 2. Application to this case

Pegasus makes no challenge to the documents already lodged by the defendants as part of the administrative record, nor does it challenge the completeness of that record. Instead, it argues that certain documents that are not part of the administrative record should nonetheless be considered by the court.[2] *See* doc. 99, p. 14 (adoption and reassertion of arguments raised in motions regarding extra-record evidence in preliminary injunction proceedings). It seeks to introduce testimony adduced at the court's January 2018 hearing on Pegasus's motion for preliminary injunction, in support of all claims for relief. Doc. 65; doc. 49, att. 1, p. 27. It argues that the above documents are relevant to determining the sufficiency of the defendants' analysis of the proposed actions under NEPA and/or the NHPA. The defendants oppose the inclusion of this material, arguing that Pegasus is improperly seeking its inclusion to second-guess the agency decision rather than review the procedures leading up to that decision. Doc. 101, pp. 30–31.

NEPA requires that an agency take a "hard look at environmental consequences" before making a decision, but only "prescribes the necessary process for preventing uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 350–

---

*Triplett v. Fed. Bureau of Prisons*, 2009 WL 792799, at *8 (N.D. Tex. Mar. 24, 2009) (citing *ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174, 185 (1999)).

[2] Plaintiffs originally sought to introduce the specific documents cited herein in support of their request for preliminary injunctive relief. *See* doc. 49, att. 1. The court agreed to inclusion of the materials for its consideration of the preliminary injunction only, and deferred consideration of the other grounds for inclusion. Doc. 67, p. 4.

51 (1989). Accordingly, a NEPA claim attacks the agency's procedures in considering the environmental impact of a project. "The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to attention." *Nat'l Audubon Soc'ty v. Hoffman*, 132 F.3d 7, 15 (2d Cir. 1997). Thus, "deviation from the record rule to review procedural integrity in a NEPA claim is a logical conclusion." *Save Our Wetlands, Inc. v. Conner*, 1999 WL 508365, at *2 (E.D. La. Jul. 15, 1999) (citing *Sierra Club v. Hassell*, 636 F.2d 1095, 1097–98 (5th Cir. 1981)).

The NHPA also imposes procedural rather than substantive requirements on agency action. *Coliseum Square Ass'n*, 465 F.3d at 225. Under NHPA § 106, the government must "take into account the effect any federal undertaking might have on [a historic site]." *Id.* (quoting *United States v. 162.20 Acres of Land*, 639 F.2d 299, 302 (5th Cir. 1981)); *see also* 54 U.S.C. § 306108 (the government "shall take into account the effect of the undertaking on any historic property"). Accordingly, the agency must identify historic properties that are eligible for listing on the National Register and assess the proposed project's effects on any qualifying properties. 54 U.S.C. §§ 306108, 300320. To this end the agency may need to consult with other interested parties, in a process known as "Section 106 consultation." *See* 36 C.F.R. §§ 800.3–800.6.

Admission under the NEPA exception or the general exception relating to consideration of relevant factors is not automatic. Instead, the court should only consider extra-record evidence where "the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed actions." *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Svc.*, 883 F.3d 644, 658 (6th Cir. 2018) (quoting *Hoffman*, supra, 132 F.3d at 15). Where those documents are cumulative of the administrative record, their admission should be denied. *Id.* at 658–59. Additionally, "exceptions

to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130–31 (9th Cir. 2012) (internal quotation marks and alterations omitted). Post-decision information "may not be advanced as a new rationalization for either sustaining or attacking an agency's decision." *Sw. Ctr. for Biological Diversity*, 100 F.3d 1443, 1450 (9th Cir. 1996); *accord Latin Americans for Social and Econ. Dev. v. Admin'r of Fed. Hwy. Admin.*, 858 F.Supp.2d 839, 856 n. 11 (E.D. Mich. 2012) (citing *Wisconsin Elec. Power Co. v. Costle*, 715 F.2d 323, 327 (7th Cir. 1983)) & *Coalition of Concerned Citizens to MakeARTSmart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 2016 WL 8919680, at *3 (D.N.M. Jul. 15, 2016); *cf. Oceana, Inc. v. Locke*, 674 F.Supp.2d 39, 47 (D.D.C. 2009) (striking post-decisional testimony but noting that, in a previous case, a post-decisional letter by a scientist challenging the manner in which an agency relied on her own research was properly admitted as extra-record evidence). "Although [the duty to consider new information] may be true for an agency, the Court's role . . . is to review the [agency's] decision to grant [an] application based upon the materials before the [agency] at the time of its decision and upon acceptable extra-record materials, if any." *MakeARTSmart*, 2016 WL 8919680 at *3.

### a. *Extra-record evidence offered in support of NEPA claims*

In support of its NEPA claims, Pegasus moves for consideration of (1) letters from Jeannette Beranger and Phillip Sponenberg; (2) a declaration from Jeff Dorson, director of the Humane Society of Louisiana; (3) FOIA responses from the USDA and the Army; and (4) a declaration from Bruce Nock. Doc. 49, att. 1, pp. 18–23. It argues that this evidence is relevant because the Army's EA failed to make certain considerations required under NEPA, namely

relating to the effect of its program on the horses themselves and the range of available alternatives. *Id.* at 18.

### i. *Beranger and Sponenberg letters*

Pegasus seeks introduction of letters from Jeannette Beranger, programs manager at a livestock conservancy nonprofit, and Dr. Phillip Sponenberg, a professor of pathology and genetics at the Virginia-Maryland College of Veterinary Medicine.[3] Doc. 43, atts. 8 & 9. Beranger and Sponenberg argue that the trespass horses could be "a remnant population of a Colonial Spanish strain of horses known as the Choctaw horse," and that if this is the case, they "could be of genetic, cultural, and historical importance to the region." Doc. 43, att. 8, p. 1; doc. 43, att. 9. They base these suppositions on visual assessments and the herd's alleged history of isolation, but acknowledge that a conclusion cannot be reached without further investigation. Doc. 43, atts. 8 & 9. Sponenberg's letter is undated while Beranger's is dated February 12, 2017. Since that time, Sponenberg has also submitted an amicus curiae brief and attached declaration, dated April 13, 2018, in which he states that he believes that "some of the horses at Fort Polk are of the Choctaw strain and Colonial Spanish type." Doc. 82, att. 1.

These materials appear to be submitted in support of Pegasus's contention that the Army's EA did not take relevant concerns into account. The defendants do not offer any specific objections to the materials but assert generally that the extra-record material should be excluded as post-decisional and second-guessing the merits of the agency's decision. Doc. 101, p. 30. To the extent that these opinions were formed after the Army's final decision in August 2016, they should be excluded. Even if Pegasus could show that these opinions predate the decision, it could not demonstrate that they point to some deficiency in the decision-making process under NEPA. The

---

[3] Beranger's letter includes an attached article describing characteristics of the "Colonial Spanish" horse population, identified by her organization as a distinct and threatened breed. Doc. 43, att. 8.

FONSI relies on the Eastern District's holding that "the subject horses are trespass horses that have roamed from adjacent areas and farm areas onto military and Forest Service lands," and that there is no "competent, credible evidence that [they] are or were ever 'wild horses' within the meaning of the WHBA." JRTC-A-000004. The record shows that the Army did consider the horses' origins. The new materials are not enough to support a claim of procedural deficiencies under NEPA and will not be considered.

### ii. *Dorson declaration*

Pegasus also relies on a declaration from Jeff Dorson, director of the Humane Society of Louisiana. Doc. 43, att. 5. He states that his organization received anonymous complaints in January 2018 relating to the round-up of horses at Fort Polk. *Id.* This information is clearly post-decisional and cannot be used to support Pegasus's claim of inadequate consideration of alternatives or impacts under NEPA.

### iii. *FOIA responses*

Pegasus submits a "no records" response received from the USDA Natural Resources Conservation Service (USDA-NRCS) and the Army in response to 2017 and 2015 FOIA requests submitted to those agencies, seeking recent analyses done on the herd and other investigations on natural resources at Fort Polk. Doc. 43, att. 15. It does not cite these documents anywhere in its briefing on the motions for summary judgment. There is thus no basis for the court to consider them, regardless of whether they may be properly admitted as extra-record evidence. Additionally, the record described below shows that the agency did rely on multiple government studies of the herd and the site. Even if Pegasus could show that the FOIA responses were admissible, they are not enough to show proper consideration of any relevant issue in this litigation.

### iv. Nock declaration

Finally, Pegasus relies on a declaration from neurobiologist Dr. Bruce Nock. *See* doc. 49, att. 2. He describes the impact of stress on animals and criticizes the Army's failure to provide any information "about where the horses will be relocated to or what provisions and precautions will be implement[ed] to assure the welfare of relocated horses." *Id.* at 3–11. Accordingly, he argues that the Army's plan lacks the information required for a "responsible" horse management or horse removal plan. *Id.* at 2. Insofar as Nock's declaration relates to the elements the Army was required to consider in weighing plan alternatives it will be considered. It cannot be used, however, to contradict the Army's own findings where it is shown that the agency did consider these factors.

### b. Extra-record evidence offered in support of NHPA claims

In support of the NHPA claims, Pegasus seeks to introduce (1) a declaration from Dr. Thomas King; (2) the Beranger and Sponenberg letters; and (3) declarations and other materials from Pegasus member Rickey Robertson. Doc. 49, att. 1, pp. 23–27.

### i. King declaration

King is a private consultant in cultural resource management and environmental review. Doc. 43, att. 3, p. 6. Based on a review of "the September 30, 2017 testimony of Rickey Robertson and other data pertinent to the Pegasus litigation," he opines that Peason Ridge constitutes a cultural landscape as defined under a National Park Services brief and that the land and even the horses themselves may be eligible for inclusion on the National Register of Historic Places. *Id.* at 1–2. He also maintains that the Army fell short of its obligation under the NHPA to consult with interested parties, because the public comment period was insufficient and that at least a public meeting should have been held. *Id.* at 3–5. He testified to this effect at the preliminary injunction

hearing. Doc. 62, pp. 17–33. The court will consider his declaration and testimony only so far as they relate to the adequacy of the consultation process.

### ii.     Beranger and Sponenberg letters

For the reasons stated above, the Beranger and Sponenberg letters do not show any procedural deficiency in the Army's consideration of the horses' origin. Accordingly, the court will not consider this extra-record in support of the NHPA claims either.

### iii.    Rickey Robertson materials

Finally, Pegasus seeks consideration of the declaration of board member Rickey Robertson, an article he authored on the history of the town of Peason, and the testimony he provided at the preliminary injunction hearing. *See* doc. 1, att. 1; doc. 43, att. 10; doc. 62. Robertson is a resident of Peason, Louisiana, and a descendant of the families who originally settled the area ("Heritage Families"). Doc. 1, att. 1. He participated in the public comment period and offered his opinion on the horses' origins. JRTC-G-000427; JRTC-G-000443. The Army noted that Robertson had not substantiated his claims, leading to his theory being discounted. JRTC-G-000443. At the preliminary injunction hearing Robertson testified that he wanted to be more involved with the decision-making process, that his meeting with the commanding general was an informal one, and that he did not know he was required to have citations for his assertions. Doc. 1, att. 1; doc. 62, pp. 40–41. The court will consider Robertson's testimony and declarations as they relate to the adequacy of the Army's consultation process, but not for the merits of his claims about the horses' origins.

### c.  Miscellaneous exhibits

Pegasus seeks consideration of multiple other extra-record sources, including the transcript of the preliminary injunction hearing and articles on the history of Fort Polk and the region's

"Heritage Families." *See* doc. 49, att. 1, pp. 26–27; doc. 96, atts. 2 & 3. Other than the portions of the preliminary injunction hearing referenced above, namely the testimony of King and Robertson, Pegasus does not explain how these sources relate to the adequacy of the Army's review under NEPA and NHPA. Instead it argues generally that they should be considered because the record was inadequate, the issue is so complex as to require consideration of extra-record evidence, the agency decision was not adequately explained, and the sources are necessary to determine whether the agency considered all relevant factors. *Id.* These records, however, do not appear to provide any information on the adequacy of the Army's review, nor are they relied on for anything other than the plaintiff's disagreement with the result of the Army's NEPA- and NHPA-related conclusions. Additionally, the court disagrees that the issues are so complex as to require resort to extra-record evidence. Accordingly, this evidence will not be considered.

### B. Motion for Summary Judgment

#### 1. Standards

##### a. Summary Judgment

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere

allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### b. APA review

Under the APA, a court may only set aside an agency action in limited circumstances, including, as raised here "if it is arbitrary [and] capricious . . . or otherwise not in accordance with law." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 580 (5th Cir. 2016); *see* 5 U.S.C. § 706(2). The court presumes that the agency's decision is valid and so the burden is on the party challenging the agency action to demonstrate that such action should be invalidated. *Buffalo Marine Svcs., Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011). "The court's role is not to weigh the evidence pro and con but to determine if the agency action was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Delta Found. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (internal quotations omitted). The challenged agency decision "need not be ideal, so long as it is not arbitrary and capricious, and so long as the agency

gave at least minimal consideration to relevant facts contained in the record." *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (internal quotations omitted).

### 2. Application to this case

#### a. NEPA violations

Pegasus argues that the Army fell short of its obligations under NEPA in the selection of a horse removal plan by relying on an inadequate EA and failing to conduct an EIS. Doc. 99, pp. 8–9, 28–42.

NEPA was enacted as "a broad national commitment to protecting and promoting environmental quality." *Robertson*, 490 U.S. at 348. As noted above, however, it is a "procedural statute" and only requires that any federal project that significantly affects the environment "be an environmentally conscious one." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992). Instead, it "merely prohibits uninformed—rather than unwise—agency action." *Id.* (quoting *Robertson*, 490 S.Ct. at 351).

NEPA's "central requirement" is that, except in certain qualifying situations, the agency must complete a detailed EIS "for any major federal action significantly affecting the quality of the human environment." *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007). Accordingly, an EIS is **not** required when the federal action is not major or does not have a significant impact on the environment. *Sabine River*, 951 F.2d at 677. The agency determines the necessity of an EIS by first performing an EA, "a rough cut, low-budget environmental impact statement" designed to show whether the more costly and time-consuming EIS is necessary. *City of Dallas, Tex. v. Hall*, 562 F.3d 712, 717–18 (5th Cir. 2009) (quoting *Sabine River*, 951 F.2d at 677). After the EA, the agency prepares an EIS or issues a FONSI, briefly stating "the reasons why the proposed agency action will not have a significant impact on the environment." *Coliseum*

*Square*, 465 F.3d at 224. Under NEPA, the court must "make a searching and careful inquiry into the facts and review whether the [agency's] decision . . . was based on consideration of the relevant factors, and whether there has been a clear error of judgment." *Hall*, 562 F.3d at 717 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)). Under APA's highly deferential standard of review, however, the court "has the least latitude in finding grounds for reversal" and may not use its review "as a guise for second-guessing substantive decisions committed to the discretion of the agency." *Id.*

### i. Adequacy of the EA

Under Army regulations an EA must include descriptions of (1) alternatives considered, (2) general conditions and nature of the affected environment, and (3) environmental consequences of the proposed action and alternatives. 32 C.F.R. § 651.34(d)–(f). Pegasus argues that the EA was inadequate because it failed to consider (1) appropriate and reasonable alternatives, (2) "important baseline information" on the horses' origins and roaming patterns, or "updated information" on the horses' relationship to vegetation and other animal life in the area, (3) the consequences of the removal plan on the horses themselves, and (4) any significant mitigation measures to minimize the impacts. Doc. 99, p. 35. It also argues that the Army's use of a "decision matrix" was arbitrary and capricious. *Id.* at 39–42.

### a. Consideration of alternatives

After describing several proposed actions rejected after initial analysis, the Army identified and analyzed six alternative courses of action ("COAs"), including a "no action" alternative, to the plan ultimately selected. *See* JRTC-B-000066–83. Pegasus complains that the Army improperly limited the scope of its alternatives to plans that would eliminate the horse population rather than "reducing or managing" it and improperly rejected sterilization as an alternative.

An EA must include a "brief discussion of **reasonable** alternatives." *Ctr. for Biolog. Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (emphasis added). "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Honolulutraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014). The court's review of this issue is governed by a "rule of reason," which controls both the number of alternatives the agency must consider and the extent to which it must consider them. *Citizens Advisory Comm. on Private Prisons, Inc. v. U.S. Dep't of Justice*, 197 F.Supp.2d 226, 243 (W.D. Penn. 2001).

In this matter the project's purpose was described as "[reducing] the safety risks, training impacts, and threats to the health of the horses posed by their presence on Army-owned property at Fort Polk, Louisiana." JRTC-B-000054. The Army fleshed out the need for the proposed action over several pages, describing the dangers posed by and to the horses. JRTC-B-000054–61. It then noted options, other than removal, considered and rejected on first analysis.[4] JRTC-B-000063–64. Finally, it considered sterilization under the no-action alternative but observed that this plan would not immediately address any of the hazards posed by the trespass herd. JRTC-B-000073.

Pegasus does not show that the Army erred in limiting its consideration of these alternatives, given their significant and uncontroverted shortfalls. It claims that the Army

---

[4] These included training and exhibiting the horses, using the horses as service/therapy animals or in a prison rehabilitation program, and exclusionary and enclosure fencing. JRTC-B-000066–72. The Army rejected both service animal and prison rehabilitation programs as alternatives, after contacting several organizations and finding either low interest or concerns about the trespass horses' suitability for the organizations' interests. JRTC-B-000066–68. It rejected training and exhibition of the horses as a tourist destination because such a program was "not the mission of the JRTC and Fort Polk," the Army anticipated little demand for such an exhibition given the area's low levels of tourism, and because the plan would only address a small percentage of the horses currently on the base. JRTC-B-000067. It also rejected fencing, after describing the enormous costs (around $23.5 million to build and $800,000/year to maintain for exclusion fencing; $12 million to $89 million to build enclosure fencing) and the detrimental impact of fencing on training. JRTC-B-000068–72.

arbitrarily and capriciously rejected sterilization as a solution but fails to show that a method attacking birth rates would stop the herd's current intrusion on training grounds within a reasonable time. Accordingly, it fails to show that the Army's consideration of alternatives fell short of its regulatory requirements.

### b. Consideration of environment and baseline conditions

Under Army regulations, an EA must "address the general conditions and nature of the affected environment," including "any relevant baseline conditions focusing on specific aspects of the environment that may be impacted by the alternatives." 32 C.F.R. § 651.34(e). Pegasus complains that the EA in this matter fell short of this requirement because it "did not consider the different types or groups of horses and their particular ranges, but instead treated all of the horses as one monolithic group." Doc. 99, p. 38.

The "Affected Environment" section of the EA notes assertions from the public comment period on the possible origins of the horses, as well as the difficulty of validating these claims. JRTC-B-000084–85. Contrary to Pegasus's assertions, it specifically depicts the roaming patterns of these horses. JRTC-B-000100. It describes the current dangers to the horses on the training grounds, as well as their potential danger to privately owned horses due to lack of vaccination. JRTC-B-000085–88. It also assesses the vegetation and water resources in the area, as well as the characteristics of the training grounds. JRTC-B-000088–100. Pegasus does not show how or if this information could have been broken down based on alleged breeds within the herd, or what bearing any such analysis would have on the assessment.[5] Accordingly, it fails to show any deficiency in the EA on this basis.

---

[5] Pegasus relies on the declaration of neurobiologist Bruce Nock, who contends:

> The Army's plan does not include the most basic, and necessary, baseline information that is crucial for putting together a responsible horse management or horse removal plan, including a basic survey

### c. *Impact of removal on horses*

Pegasus next complains that the EA's consideration of environmental impacts did not adequately consider the impacts of removal on the horses themselves. The EA, however, described direct, indirect, and cumulative impacts on various environmental components, including the horses. Relative to the horses, it described the current dangers to the animals under the no-action alternative. JRTC-B-000073. It also discussed the necessity of providing forage and water after the animals were captured, the responsibility of adopting organizations for testing for disease, and monitoring for horses relocated to a private entity. JRTC-B-000073–82. It noted that the horses were not wildlife, and so declined to assess the impacts to them as a biological resource. JRTC-B-000108. Pegasus fails to show that this determination was unreasonable in light of the information before the agency, or that the Army's consideration of impacts was arbitrarily curtailed.

### d. *Mitigation efforts*

Finally, Pegasus argues that the Army failed to directly discuss mitigation measures as a component of the alternatives. Army regulations provide that the discussion of environmental consequences must include "what practical mitigation is available," and that the conclusion should clearly present "[a]ny mitigations that reduce adverse impacts." 32 C.F.R. § 651.34(f) & (g). Pegasus fails to show that such mitigation existed, however, and points to no requirement that the EA explicitly note if no mitigation is available. Accordingly, this argument shows no deficiency to the EA.

---

of the herds, their migration patterns, their family relationships, their encounters with humans, and basic descriptions of the types of horses living at Fort Polk.

Doc. 49, att. 2, p. 2. Nock does not show that this information was reasonably attainable or how it related to the selection of one removal plan over the alternatives. Instead, Pegasus's primary contention seems to be that consideration of this information would have yielded "different management options for different horse groups." Doc. 99, p. 38. It does not show, however, how such information could have rendered the non-removal options feasible under the project's defined purpose.

### e. Use of decision matrix

Pegasus also argues that the Army's use of a decision matrix to guide its consideration of various issues presented in the EA process was arbitrary and capricious. Doc. 99, pp. 39–42. It asserts that this matrix, summarized at JRTC-G-000155, "is deeply flawed, mathematically impossible, and cannot serve as the basis for any decision." *Id.* at 39. Namely, it argues that the Army arbitrarily and capriciously assigned the ratings for public perception, environmental impact, and costs under this matrix. Defendants assert, however, and Pegasus does not dispute, that the matrix was "part[] of briefings that were updated during the planning process" and "are evidence of the Army's deliberation, not its final determination." Doc. 101, p. 29. Pegasus insists that the alleged errors under the matrix must point to inadequacies in the final decision, since it alleges that "there is nothing in the administrative record which indicates that the Army used something other than the 'Decision Matrix' to support its final decision." Doc. 103, p. 21. Pegasus's only substantive disagreements with the conclusions in the EA and the consideration given to alternatives relate to its own attempt to redefine the project purpose. Furthermore, despite any differences in the ranking of alternatives, Pegasus fails to show any error to the Army's conclusion of comparable and insignificant environmental impacts. Accordingly, this alleged error does not show a NEPA violation.

### ii. Decision not to perform an EIS

Finally, Pegasus claims that the defendants violated NEPA by failing to conduct an EIS. It argues that an EIS was necessary because (1) Army regulations require an EIS due to the project's impacts and (2) the approval of the Cyclic 4 Step COA amounted to a "major federal action" under NEPA. Doc. 99, pp. 33–35. As described above, an agency may fulfill its NEPA obligations by performing an EA and then, if it determines an EIS is not necessary, issuing a FONSI stating "the

reasons why the proposed agency action will not have a significant impact on the environment." *Coliseum Square*, 465 F.3d at 224. The agency's decision not to proceed to an EIS may only be set aside if the plaintiff demonstrates that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 763 (2004).

Army regulations provide that "[a]n EIS is required when a proponent, preparer, or approving authority determines" that at least one of several criteria is met, including that the project has the potential to significantly impact environmental quality; significantly affect cultural or historical resources; that the planned action is "highly controversial from an environmental standpoint;" or that there is a potential for such actions "to either establish a precedent for future action or represent a decision in principle about a future consideration with significant environmental effects." 32 C.F.R. § 651.41. Pegasus only argues, however, that the Army failed to consider the final two possibilities and relies instead on its disagreement with the Army's findings of no significant impact under the remaining criteria. Doc. 99, pp. 8–9, 33–35.

Pegasus's disagreements with the Army's conclusions are insufficient to invalidate the EA's findings under our deferential standard of review. As for the Army's alleged failure to consider the plan's potential to set precedent for similar actions at Fort Polk and on other installations, such claims are viewed with skepticism. *See Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (noting that EAs "are usually highly specific to the project and the locale, thus creating no binding precedent.") As the defendants point out, the EA applies only to Fort Polk, and Pegasus presents nothing to show that other Army installations face similar challenges with trespass horses. Pegasus also fails to show that any similar challenge would

continue to exist at Fort Polk after removal of the trespass horses. Accordingly, it cannot demonstrate that an EIS was warranted on this basis.

As for the controversy factor, Army regulations state that an EIS is required upon a determination that the planned action would "[b]e highly controversial from an environmental standpoint." 32 C.F.R. § 651.41(i). NEPA provides that an agency must provide an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Associated regulations define the term "significantly" in terms including "intensity," for which one consideration is "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). The term "controversial," however, "is not synonymous with 'opposition.'" *Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs*, 498 F.Supp.2d 365, 376–77 (D. Me. 2007). "Otherwise, opposition, and not the reasoned analysis set forth in an environmental assessment, would determine whether an environmental impact statement would have to be prepared. . . . The outcome would [then] be governed by a 'heckler's veto.'" *Id.* (quoting *North Carolina v. Fed. Aviation Admin.*, 957 F.2d 1125, 1134 (4th Cir. 1992)) (cleaned up).

In the August 2016 FONSI, Brigadier General Gary Brito concluded that "the selection of any of the proposed COAs would have no significant impact on the environment" and that an EIS was therefore not required. JRTC-A-000005. Pegasus argues that nearly 850 comments were submitted and that "the majority . . . [were] opposed to various environmental, historic, and cultural impacts of this action." Doc. 99, p. 33. Accordingly, it maintains, the public outcry reflected that the action would have significant impact on the human environment. Pegasus presents nothing from the record to substantiate this controversy, nor does it show that the Army failed to consider

legitimate issues raised in the comments. Accordingly, the Army's failure to specifically consider public controversy does not show that it fell short of its obligations under NEPA.

### b. NHPA violations

The NHPA was enacted to encourage historic preservation in federal and federally-assisted projects. *Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 462 (5th Cir. 2011). Like NEPA, the NHPA is procedural in nature and does not mandate a particular outcome. *Coliseum Square Ass'n*, 465 F.3d at 225. Instead, under Section 106 of the NHPA (codified at 54 U.S.C. § 306108) federal agencies may not approve the expenditure of funds on a project without considering "the effect of the undertaking on any historic property." Accordingly, the agency must first evaluate the project to determine if it has "the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). To this end, it should consult with other interested parties in order to identify historic properties potentially affected, "assess the proposed undertaking's effects and seek ways to avoid, minimize or mitigate any adverse effect on historic properties." 36 C.F.R. § 800.1. If the agency determines that the proposed undertaking "does not have the potential to cause effects on historic properties, assuming such properties were present, the agency has no further obligation" under the NHPA. 36 C.F.R. § 800.3(a)(1). Pegasus argues that the Army fell short of its obligations under the NHPA because it did not consider the herd itself as a historic property or a component of a historic property.

In the EA, the Army recognized the presence of "cultural resources" in the area and referenced the installation's 2012 *Integrated Cultural Resources Management Plan* ("ICRMP"). JRTC-B-000108. It then noted that "[t]he proposed action and the associated courses of action would not impact a known archeological site or negate the authority of the ICRMP" and that "this resource area was [thus] eliminated from further analysis." *Id.* During the public comment period,

the Army received an email referencing an article titled "Wild Horses Are Cultural Resources" and requesting "consultation results between Fort Polk and the Louisiana State Historic Preservation Office regarding [NHPA] Sec 106 compliance." JRTC-B-000854–55. The Army responded by quoting the language from 36 C.F.R. § 800.3(a)(1) cited above and then stating that "[i]t is Fort Polk's determination that the actions proposed [do] not have the potential to cause effect to historic properties." JRTC-B-000855.

Pegasus complains that the Army's response was insufficient, because it did not provide "any adequate evidence . . . that it actually evaluated the potential effects on historic properties" and appeared to limit its consideration of such properties to "known archeological sites." Doc. 99, p. 21. It asserts that the record contains "scant" references to historic properties, and that the Army failed to consider any "unknown" archeological sites or views that the horses themselves were a cultural or historic resource. *Id.* at 21–24. It also disputes the defendants' contention that the plain language of NHPA-related regulations provides no basis for determining that living animals are eligible for inclusion on the National Register of Historic Places.[6] *Id.*

As the defendants note, the record contains Fort Polk's existing procedures to conduct cultural resource surveys and identification of historic properties potentially covered by the NHPA, including the 2012 ICRMP and 1999 Historic Preservation Plan. JRTC-E-000001–279. It also summarizes the Army's view, at the conclusion of the public comment period, that based on the

---

[6] Under the NHPA's implementing regulations, a historic property is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(l)(1). The term includes artifacts, records, and remains related to and located within such sites. *Id.*

Criteria for National Register inclusion is set forth under 36 C.F.R. § 60.4, which states: "The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association" and have certain associations with significant events or people, embody certain distinctive characteristics, or "have yielded, or may be likely to yield, information important to prehistory or history."

"[e]vidence given, it is highly unlikely that the [trespass horses] have any ancestry to US Cavalry horses or to any feral horses from previous periods." JRTC-G-000443. Given this documentation and the conclusions reached in the COLAA litigation on the horses' origins,[7] Pegasus fails to show that the defendants were insufficiently informed about potential historic significance of the herd or the land on which it roamed. Their assertions on the horses' origin, which their own experts still treat as mere hypotheses and for which they provided limited documentation other than local folklore, are not enough to show that any determination that the herd was not of special historical significance is unreasonable.

Pegasus also fails to show that the Army fell short of its obligation to consult with interested parties in identifying such properties.[8] King asserted at the preliminary injunction hearing that the Army "short-circuited the Section 106 process" because the defendants "treated what they call cultural resources pretty much solely as archeological sites." Doc. 62, p. 27. Pegasus board member Rickey Robertson complains that he offered his opinions on the herd's origins but that the Army gave his position inadequate consideration due to his inability to provide citations. Doc. 1, att. 1; doc. 62, pp. 37–41. At the preliminary injunction hearing, he stated that he had provided the commanding general with a letter and several attachments relating to his opinion on the horses.

---

[7] Pegasus argues that any claim of reliance on the COLAA litigation and its findings is a post-hoc rationalization by the Army. It asserts that the Army never expressly relied on the COLAA litigation in this matter. Doc. 103, pp. 11–15. It also alleges that only the COLAA decision (and not the underlying record) is contained in the administrative record for this matter. *Id.* As the defendants observe, however, the Army pointed out the importance of the COLAA litigation in its EA and in other documents contained in the administrative record. *See, e.g.*, JRTC-B-000054 (EA); JRTC-B-000242–63 (notice of intent). Additionally, the COLAA record of environmental consideration and its supporting documents are included in the record, along with a 2010 EA concerning sterilization and a 2010 REC concerning public capture. *See* JRTC-E-002980–3139; JRTC-E-003524–3560; JRTC-E-003564–4565. Accordingly, as the defendants assert, the record shows not only that reliance on the COLAA findings and record was reasonable, but also that the Army has given the trespass horses careful study for several years.

[8] Pegasus also points to the Army's decision to ignore the request for a tour made by a student attorney from the Tulane Environmental Law Clinic, which provides representation for Pegasus in this matter. *See* JRTC-G-000157. It argues that this treatment reflected the Army's unwillingness to involve consulting parties. Doc. 99, p. 23. It fails to show, however, that the student was then representing Pegasus in any official capacity or that the decision not to accommodate the request amounted to a denial of relevant information to either Pegasus or the law clinic.

Doc. 62, pp. 42–43. He also admitted that he commented on the EA with a letter describing his concern for the horses and opinions on their origin. *Id.* at 43; *see* JRTC-B-000892–894. He complains that the defendants never told him that his opinions were being disregarded due to his failure to provide citations or other substantiation for their claims. Doc. 62, pp. 40–41. He admits, however, that after he provided his materials to General Brito, he was given a private, hour-long meeting with the general and an attorney and had additional opportunity to express his opinions. *Id.* at 42–44; *see* JRTC-G-000437–39. Given Robertson's failure to substantiate his claims beyond folklore, his multiple opportunities to express his views, and the contradictory evidence outlined in both the EA and the COLAA litigation, Pegasus fails to show that the defendants' handling of his input or determination that they should not proceed with a Section 106 analysis fell short of their consultation obligations under the NHPA.

Because of the Army's compliance with procedural statutes, there is no reason for the court to question its decision on the merits. Pegasus fails to show any basis for vacating the defendants' decision in this matter and the defendants are therefore entitled to judgment as a matter of law.

## III.
### CONCLUSION

For the reasons provided above, Pegasus's Motion for Summary Judgment [doc. 96] is **DENIED** and the defendants' Motion for Summary Judgment [doc. 101] is **GRANTED**. Accordingly, all claims in this action are **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Chambers this 27th day of March, 2019.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**